**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| Plaintiffs,<br><br>v.<br><br>Defendants. | **FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED** |

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF DELAWARE *ex rel.* Ronald Sherman,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTIANA CARE HEALTH SERVICES, INC., CHRISTIANA CARE HEALTH SYSTEM, CHRISTIANA HOSPITAL, and WILMINGTON HOSPITAL,<br><br>Defendants. | **FILED UNDER SEAL**<br><br>**DO NOT PLACE ON PACER**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    PARTIES ................................................................................................ 2

II.   JURISDICTION ..................................................................................... 4

III.  SUMMARY OF THE CASE.................................................................... 5

IV.  APPLICABLE LAW .............................................................................. 6

   A.   The Federal and Delaware False Claims Acts ................................... 6

   B.   The Anti-Kickback Statute ............................................................... 7

   C.   Violations of the Anti-Kickback Statute Forms the Basis of False Claims Act Liability.......................................................................... 11

   D.   Delaware Anti-Kickback Statute ................................................... 12

   E.   The Stark Law............................................................................... 13

   F.   Corporate Integrity Agreement ..................................................... 15

V.   PAYMENT UNDER GOVERNMENT HEALTHCARE PROGRAMS.......................... 16

   A.   Hospital Payments ........................................................................ 16

   B.   Physician Certifications and Payments.......................................... 17

   C.   Relevant Physician Current Procedural Technology ("CPT") Codes............................... 19

      1.   Neonatology and Pediatric Specific CPT Codes......................... 20

      2.   Global Bundled Surgical CPT Codes Used in Neurosurgery, Cardiology, Urology, and ENT Departments.......................... 22

   D.   Billing for Hospitalists, Residents, Physician Assistants ("PA") Nurse Practitioners ("NP") ............................................................ 27

VI.  THE FALSE CLAIMS ACT VIOLATIONS ................................................ 28

   A.   The Kickback And Stark Schemes .................................................. 28

      1.   Christiana Provided Remuneration to Private Physician Groups To Induce Referrals of Patients............................................... 28

          a.  Remuneration in the Form of Free Services ...................... 28

             i.    Kickbacks from Christiana Hospital NICU to Neonatology Associates ........ 29

             ii.   Additional, Similar Kickback/Stark Violations Involving the Neurosurgical Unit and the Heart Center....................... 36

             iii.  Additional, Similar Kickback/Stark Violations Involving the Urology and ENT Departments .................. 39

COUNTS .................................................................................................... 43

**RELATOR'S COMPLAINT PURSUANT TO
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND THE
DELAWARE FALSE CLAIMS AND REPORTING ACT,
DEL. CODE ANN. TIT. 6, §§1201 *ET SEQ.*__**

Plaintiff Ronald Sherman ("Relator") brings this action on behalf of the United States of America and the State of Delaware, against defendants Christiana Care Health Services, Inc., Christiana Care Health System, Christiana Hospital, and Wilmington Hospital (collectively "Defendants" or "Christiana") for violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* and the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*

## I.      PARTIES

1.      The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid programs, and other federally funded health care programs.

2.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395- 1395 *et seq.*; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease.

3.      TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. *See* 32 C.F.R. § 19 *et seq.*

4.      The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

5.      The Medicaid Program, 42 U.S.C. § 1396 *et seq*., is a government health insurance program funded jointly by the federal and state governments. Each State administers its own Medicaid program; however, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of a State's Medicaid payments - the Federal Medical Assistance Percentage - is based on a States' per capita income compared to the national average. Hereinafter, Medicaid, Medicare, TRICARE, and the Veterans Administration will be referred to as "government healthcare programs."

6.      The State of Delaware is a plaintiff to this action. The State of Delaware brings this action on behalf of the Delaware Medical Assistance Program ("Medicaid").

7.      Relator Ronald B. Sherman is a plaintiff to this action.   Relator graduated from the State University of New York at Buffalo in 1972 and the University of Maryland in 1976.   Relator received his juris doctorate from Brooklyn Law School in 1984.   After several years working as an attorney, Relator entered into a non-legal compliance career, becoming a Chief Compliance Officer at Bassett Healthcare in Cooperstown, New York from February 2000 through January 2004.   From February 2004 through March 2006, Relator was the Vice President and Chief Compliance Officer at Critical Care Systems International in Nashua, New Hampshire.   From August 2007 through December 2014, Relator served as Chief Compliance Officer for defendant Christiana Care Health Systems in Newark, Delaware. As the CCO, Relator held quarterly Management Compliance Committee meetings at Christiana Hospital in Newark, which were attended by Christiana Care executives including the Chief Executive Officer, the Chief Financial Officer, the Chief Medical Officer, and other executives.   During the same period, Relator attended the quarterly meetings of the Christiana Board Audit and Compliance Committee, which consisted of several Board members and as well as other consultants chosen by the Board. Prior to each

meeting, Relator would develop and circulate an agenda and other educational materials for Committee Members, as well as prepare the Minutes of the previous meeting, for the Committee's review and acceptance at the beginning of the next meeting.

8.      To Relator's knowledge, none of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4) and 6 Del. C.  § 1206(b).  If such a public disclosure did occur, Relator asserts that he is an original source of the facts alleged in this Complaint.

9.      Defendant Christiana Care Health Services, Inc. is a privately-owned, not-for-profit health system that includes two hospitals, Christiana Hospital located at 4755 Ogletown-Stanton Road, Newark, Delaware, 19718 and Wilmington Hospital located at 501 W 14th St, Wilmington, Delaware, 19801. Christiana Hospital is a high risk delivery hospital offering a Level III neonatal intensive care unit ("NICU").  Over 7,200 babies are born at Christiana Hospital each year.   In addition to the NICU, Christiana Hospital has other specialty services, including the Helen F. Graham Cancer Center and the Center for Heart & Vascular Health which performs more than 500 open-heart surgical procedures per year, plus thousands of diagnostic and interventional procedures. The Wilmington Hospital is a 241-bed facility that includes, an emergency department, center for rehabilitation, center for advanced joint replacement, outpatient primary care services, diagnostic imaging and medical laboratory services and a surgical center.

## II.      JURISDICTION

10.      Jurisdiction is founded upon the federal False Claims Act, 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b).  This Court also has jurisdiction over this action pursuant to 28 U.S.C §§1331 and 1345.  Defendants reside within and is doing and/or previously did business within the District.

4

11.     Venue lies in the District pursuant to 31 U.S.C. §3732(a), and 28 U.S.C. §§1391(b) and 1391(c) because a substantial part of the acts complained of herein occurred in this District, including without limitation, acts proscribed by 31 U.S.C. §3729 *et seq*.

## III.    SUMMARY OF THE CASE

12.     In violation of the federal and Delaware False Claims Acts, from prior to 2010 to the present, Defendants knowingly engaged in a scheme to induce doctors to make referrals of patients to Christiana, thereby violating the Federal Fraud and Abuse Anti-Kickback and/or the Prohibited Referral Provisions of 42 U.S.C. §§1320a-7b (hereinafter referred to as the "Anti-Kickback Law" or "AKS"), and the Delaware Anti-Kickback Statute, 31 Del. C. § 1005.   When, subsequent to the AKS violations, Defendants submitted bills to government healthcare programs, Defendants violated the FCA and the DE FCA. In addition, because Christiana's payment of in-kind remuneration to private physicians created a financial relationship, Christiana and physicians with these financial relationships with Christiana violated the Stark Law, 42 U.S.C. § 1395nn, when they "referred" patients to Christiana and care for these patients was subsequently billed to government payers.

13.     More specifically, starting sometime prior to 2010, Christiana had an exclusive contract with a private outside neonatology group of physicians, Neonatology Associates, whereby the Group would manage all care and procedures in the Neonatal Intensive Care Unit ("NICU") at Christiana Hospital and would subsequently bill a 24-hour global/bundled CPT code to government healthcare programs for the work performed.

14.     In violation of the AKS and Stark Law, Christiana provided free services to Neonatology Associates in the form of professional care provided to infants in the NICU by Christiana-employed hospitalists, residents, and nurse practitioners.  These Christiana employees provided most of the professional care and procedures in the NICU, while Neonatology Associates

billed for and was reimbursed for that/those care/procedures.  Christiana provided these free services in exchange for referrals of patients to Christiana.

15.    Similar to the scheme above, during his tenure at Christiana, Relator became aware of the similar kickback scheme occurring in the Neurosurgical practice, the Cardiovascular Surgery practice, the Ear, Nose and Throat practice, and the Urologic Surgery practice.

16.    Both Christiana and the private surgical groups in these various practice areas subsequently submitted claims for the care provided to patients who were insured by government healthcare programs.  Billing for services provided pursuant to a Stark violation or a  kickback relationship violates the FCA and the DE FCA.

17.    In addition, the claims submitted by private physicians were false for a second reason.  Specifically, the private physicians billed the government as if they themselves had performed services, when in fact the services were provided by Christiana hospital employees. Indeed, the private physicians often billed for services they allegedly provided – but in fact were provided by Christiana employees – on days the doctors were not at Christiana.   Christiana "caused" these claims to be submitted within the meaning of the FCA and the DE FCA.

## IV.    APPLICABLE LAW

### A.    The Federal and Delaware False Claims Acts

18.    The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(l)(A)-(B).

19.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance

of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(l)(B).

20.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded .... " 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

21.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

22.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.* is modeled after the Federal FCA, and contains provisions similar to those quoted above. Relator asserts claims under the Delaware False Claims Act for the state portion of the Medicaid false claims detailed in this complaint.

### B.     The Anti-Kickback Statute

23.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of

7

kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987

to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.[1]

24.     The AKS prohibits any person or entity from offering, making, soliciting, or

accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person

for purchasing, ordering, or recommending or arranging for the purchasing or ordering of

federally-funded medical goods or services:

> (i)     Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> (a)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (b)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (ii)     Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
> (a)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (b)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

---

[1] *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

42 U.S.C. §§ 1320a-7b(b).  Violation of the statute can also subject the perpetrator to exclusion form participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose.  42 U.S.C. §§ 1320a-7(b)(7) and 42 U.S.C. §§ 1320a-7a(a)(7).

25.     The legislative and administrative history of the AKS safe harbors indicate that anything of value should be considered remuneration.

26.     In promulgating final rules on the AKS, the Office of the Inspector General of the Department of Health and Human Services, stated that "the meaning of two of its [the AKS statute's] terms deserve comment (1) 'any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind;' and (2) 'to induce.' These terms demonstrate congressional intent to create a very broadly worded prohibition." 56 FR 35952 (1991).

27.     The OIG continued,

Congress's intent in placing the term "remuneration" in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever. The statute's language makes clear that illegal payments are prohibited beyond merely "bribes," "kickbacks," and "rebates," which were the three terms used in the original 1972 statute. The language "directly or indirectly, overtly or covertly, in cash or in kind" makes clear that the form or manner of the payment includes indirect, covert, and in kind transactions .... The meaning of the term "to induce," which describes the intent of those who offer or pay remuneration in paragraph (2) of the statute, is found in the ordinary dictionary definition: "to lead or move by influence or persuasion"

*Id*. (citing The American Heritage Dictionary (2d College Ed. 1982)).

28.     As the sponsor of the bill explained,

[K]ickbacks are wrong no matter how a transaction might be constructed to obscure the true purpose of a payment ... We are in a complex area where right and wrong are often clouded with shades of gray. In such situations, the committee stresses the

9

need to recognize that the substance rather than simply the form of a transaction should be controlling.

123 Cong. Rec. 30,280 (1977).

29.     An opportunity to bill or earn money is remuneration that could induce a person "to channel potential Medicare payments towards a particular recipient." *Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d at 29; *see also, United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, * 17-*23 (S.D. Ohio Dec. 18, 2008) (accepting the government's argument that an opportunity to bill is remuneration and that a doctor being "handed a stream of patients ... is like receiving a voucher.").

30.     As the Court wrote in *Fry*,

Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient ... Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever. *Id*. at 21-23 (internal citations omitted).

31.     Furthermore, a person who offers or pays remuneration to another person violates the Anti-Kickback Act if even one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals.  *See United States v. Greber*, 760 F.2d 68, 72 (3d. Cir. 1985).

32.     Specific intent is not required to establish a violation of the AKS. That is, "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § l 320(a)-7b(h)).

33.     A "Federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The Anti-Kickback Statute applies to claims submitted to Medicare, Medicaid, and the other government payers listed in this case.  42 C.F.R. § 405.207.

10

34.    None of the "safe harbors" to the AKS are applicable here. *See* 42 C.F.R. §1001.952.

### C.    Violations of the Anti-Kickback Statute Forms the Basis of False Claims Act Liability

35.    Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare and Medicaid fraud and abuse. *See Greber*, 760 at 70-71. Because kickback schemes negatively affect the integrity of federal health care programs, government payers have a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al*., (3d Cir. Oct. 2010) (No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant).

36.    To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare/Medicaid programs.[2]

37.    These and other courts have held that a person or entity who violates the and causes another to submit claims to the government has violated the False Claims Act regardless of what form the claim or statement takes.  Many of these courts have reasoned that the claims are false,

---

[2] *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Roberts v. Aging Care Home Health*, 2007 U.S. Dist. LEXIS 92864, *11 (W.D. La. Dec. 17, 2007); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*., 20 F.Supp.2d 1017, 1042 (S.D. Tex. 1998); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[3]

38.     Moreover, the AKS was recently amended to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).

### D.     Delaware Anti-Kickback Statute

39.     The Delaware Anti-Kickback Statute ("DAKS") makes it unlawful:

- to solicit or receive any kickback, rebate or bribe directly or indirectly, overtly or covertly, in cash or in kind "in return for referring an individual to a provider for the furnishing or arranging for the furnishing of any medical care or medical assistance for which payment may be made in whole or in part under any public assistance program. 31 Del. C. § 1005(a)(1);

- to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person "to refer an individual to a provider for the furnishing or arranging for the furnishing of any medical care or medical assistance for which payment may be made in whole or in part under any public assistance program. 31 Del. C. § 1005(b)(1); and

- for a provider to charge, solicit, accept or receive for any service provided to a recipient, money or other consideration in addition to or at a rate in excess of the rates established by the State for such item or service. 31 Del. C. § 1005(c)(1).

---

[3] *See, e.g., United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Roberts*, 2007 U.S. Dist. LEXIS 92864, *11 (holding defendants both presented a false or fraudulent claim for payment and relied on a false or fraudulent statement or record to obtain payment from Medicare once Defendants obtained payment from Medicare for services "performed under a prohibited referral). *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899, 902 (5th Cir.1997*); United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc*., 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp*., 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig*., 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc*., 234 F.R.D. 113, 121 (W.D. Pa. 2001).

40.     Here, Defendants violated the DAKS by offering remuneration and incentives, in various forms, to induce physicians to make referrals to Christiana for health services billed to Medicare and Medicaid. Similarly, the physicians violated the DAKS by accepting remuneration in exchange for referrals.  As previously explained, these underlying DAKS violations provide the foundation for false claims act liability under the DE FCA.

**E.     Stark Law**

41.     The Stark Law prohibits hospitals from submitting claims to Medicare for services provided to patients who were referred by a physician with whom the provider has an impermissible "financial relationship."   42 U.S.C. § 1395nn(a)(1).  Stark was designed by Congress to remove monetary influences from physicians' referral decisions, and thereby protect federal health care programs from paying for the costs of questionable utilization of services. The Stark Law establishes a presumptive rule that providers may not bill, and Medicare/Medicaid will not pay, for certain health care services generated by a referral from a physician with whom the provider has a financial relationship.

42.     In relevant part, the Stark Law states:

(a) Prohibition of certain referrals

(1) In general
Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –
(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

* * * * *

(g) Sanctions

13

(1) Denial of payment

No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.

(2) Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amounts so collected.

42 U.S.C. § 1395nn(a), (g).

43.     The Stark Law broadly defines "financial relationship" to include any "compensation arrangement" between the provider and the referring physician. 42 U.S.C. § 1395nn(a)(2). "Compensation arrangement" is further defined to mean "any arrangement involving any remuneration between a physician . . . and an entity." "Remuneration" means "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(A), (B).

44.     The Stark Act defines "referral" as "the request by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician)." 42 U.S.C. § 1399nn(h)(5)(A). The "oft-stated goal" of the Act is "to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." *See* Jo-Ellyn Sakowitz Klein, The Stark Laws: Conquering Physician Conflicts of Interest? 87 Geo. L.J. 499, 511 (1998).

45.     Once the relator or the government establishes the existence of referrals and a financial relationship, the burden shifts to the defendant to establish that its conduct fits into one of the Stark Act "exceptions."  None of the Stark Act's exceptions are applicable here.

14

### F.      Corporate Integrity Agreement

46.      On February 24, 2010, Christiana Care Health System entered into a Corporate

Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") for a different False

Claim Act violation (relating to the neurology practice area).[4]  The CIA required Christiana to:

- Create procedures designed to detect potential violations of the AKS and the Stark Law

- Maintain a disclosure program designed to encourage internal reporting of, *inter alia*, potential AKS and Stark Law violations

- Report probable violations to the government

- Identify and report overpayments to the government (defined as the amount of money received in excess of the amount due and payable under any federal health care program requirements)

- Return overpayments to federal health care programs within 30 days of identification

- Submit annual reports summarizing the status of the implementation of the CIA's requirements

47.      In violation of these provisions, Christiana did not report to the government any of

the violations described below, nor did it return to the government any of the overpayments

described below.   Instead, Christiana certified to the government its compliance with these

requirements, while knowing that it was violating same.  The conduct violates the reverse false

claims provisions of the FCA and the DE FCA.  *See, e.g., U.S. ex rel. Matheny v. Medco Health

Solutions,* 671 F.3d 1217 (11th Cir. 2012); *Ruscher v. Omnicare Inc.,* No. 08-3396, 2014 WL

4388726 (S.D. Tex. Sept. 5, 2014); *U.S. ex rel. Boise v. Cephalon, Inc.*, No. 08-287, ECF No. 131

(E.D. PA July 21, 2015).

---

[4] The CIA is attached hereto as Exhibit A, and is hereby incorporated by reference as if fully set forth herein.

## V.     PAYMENT UNDER GOVERNMENT HEALTHCARE PROGRAMS

### A.     Hospital Payments

48.     Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Christiana, derive a substantial portion of their revenue from the Medicare Program.

49.     Hospital inpatient services are reimbursed under the Inpatient Prospective Payment System. This is a system developed for Medicare to classify hospital cases into one of approximately 500 groups, also referred to as diagnosis-related groups ("DRG"), which are expected to require similar hospital resources/costs.

50.     Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a CMS Form UB-04 (also known as the CMS Form 1450).

51.     The payments hospitals received under the DRG system are bundled payments, *i.e.*, the hospital is reimbursed a flat fee for treating the patient for the DRG in question. That fee is intended to reimburse the hospital in full for all of the services provided to an individual patient, *i.e.*, the flat fee is for the cost of running the hospital building itself, the cost of medications provided to patients, and nursing care costs.

52.     The Medicaid Program is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is primarily limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program. Payments to hospitals from Delaware Medicaid are, like Medicare, based on the DRG system, *i.e.*, the payments are a flat fee based on the patient's

16

diagnosis. The flat fee is a bundled/composite rate which takes into account the cost of running the hospital building itself, the cost of medications provided to patients, and nursing care costs.

53.     All Defendants named herein sought reimbursement from the Delaware State Medicaid program for the time period pertinent to this Complaint.

### B.     Physician Certifications and Payments

54.     To be reimbursed by Medicare, Medicaid, and other federal health care programs, health care providers must first apply for and obtain a National Provider Identification ("NPI") number which is a unique, 10-digit number assigned by CMS. The provider's NPI number is used on claims for government reimbursement.

55.     In addition, to bill the Delaware Medicaid program, physicians must sign a provider agreement. Among other certifications, each provider physician must agree to "comply with all applicable State and Federal Medicaid laws and policy and rules and regulations promulgated pursuant thereto."

56.     Providers submit claims to Medicare and other federal health care programs for reimbursement for physician services by using CMS Form 1500. Most all claims are filed electronically. The claim form has different numbered fields that the provider must fill in such as the patient's name, address, insured's I.D. number, referring physician's name and patient's diagnosis. The form also requires the provider to list all CPT codes for the medical procedures performed (field number 24D on the claim form) and the "Rendering Provider" NPI number for each CPT code (field number 24J).

57.     The physician must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500 which include the following relevant statements:

**SIGNATURE OF PHYSICIAN OR SUPPLIER
(MEDICARE, CHAMPUS, FECA AND BLACK LUNG)**
I certify that the services shown on this form were ... personally furnished by me
or were furnished incident to my professional service by my employee under my
immediate personal supervision
*****
**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**
*****
**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services
listed above were ... personally furnished by me or my employee under my
personal direction. NOTICE: This is to certify that the foregoing information is
true, accurate[5] and complete.

(footnote added).

58.     The physician name and NPI numbers listed on the CMS Form 1500 must be the name and identification number of the provider who actually rendered the services to the patient. Medicare instructs physicians and coding staff to list the physician name (claim field location 31) and NPI number of the physician (claim field location 24J) who actually rendered the service to the patient on the CMS Form 1500. Failing to include the appropriate name and NPI number of the physician who actually rendered services to a patient is false because of the personal performance certification noted above, *i.e.*, the certification on the reverse side of Form 1500 which states that the services performed were personally performed by the provider or by an employee under their supervision.

59.     The Office of Inspector General ("OIG") has specifically identified the misuse of NPI numbers as a potential area for fraud in coding and billing government health care programs. Specifically, in the OIG's Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 2000), states "The following risk areas associated with billing have been among the most frequent subjects of investigations and audits by OIG: ... Knowing

---

[5] Among the many actions that can make a claim inaccurate, and therefore false, is backdating the documentation supporting the submitted claims.

misuse of provider identification numbers, which results in improper billing ...." 65 Fed. Reg. at

59439.

60.     The State of Delaware requires providers to enter into a "Contract for Items or

Services Delivered to Delaware Assistance Program Eligibles in the Department of Health and

Social Services" with the Department of Health and Social Services, Division of Medicaid and

Medical Assistance, Delaware Medical Assistance Program ("Medicaid" or "DMAP").  By signing

the contract, the provider agrees to abide by and comply with DMAP's rules, regulations, policies

and procedures as well as the terms of the Social Security Act.  *Contract for Items or Services*

*Delivered to Delaware Assistance Program Eligibles in the Department of Health and Social*

*Services*, Section 1 Applicable Laws and Regulations, at 1.[6]  Furthermore, the provider's

submission of any claim for payment will constitute certification by the provider that the items and

services for which the claim for payment is submitted were in compliance with the DMAP rules,

regulations, and policies, including certification that the services were actually provided and were

medically necessary.  *Id.* at 2, Section 3, Payment for Items or Services.

### C.     Relevant Physician Current Procedural Technology ("CPT") Codes

61.     Physician services and procedures, such as the hospital-based services discussed

herein, are billed using a series of standardized codes, known as Current Procedural Technology

("CPT") codes. CPT codes are published annually by the American Medical Association. The

Medicare and Medicaid programs and other Government Healthcare Programs mandate the use of

CPT codes for reporting and billing purposes. CPT codes are five digit numeric codes (which

sometimes include a numeric modifier) used to describe procedures, services and supplies. The

CPT codes are primarily used for claims processing and provider reimbursement.

---

[6] Available *at* the Delaware Medicaid website and incorporated by reference herein
http://dhss.delaware.gov/dhss/dmma/medicaid.html).

### 1.    Neonatology and Pediatric Specific CPT Codes

62.    Common CPT Codes used in neonatal and pediatric critical care, which apply only to critically ill patients who have not reached their second birthday, include the following:

- Neonatal inpatient critical care (0 -28 days), first day:  99468

- Neonatal inpatient critical care (0 -28 days), each subsequent day: 99469

- Pediatric inpatient critical care (29 days – 24 months), first day: 99471

- Pediatric inpatient critical care (29 days – 24 months), each subsequent day: 99472

63.    Neonatal and pediatric critical care codes are not time-based and cover all care given to that patient within a 24-hour period.  The only coding requirements are age and meeting the definition of requiring critical care. Daily progress notes which document the time spent at the bedside is not required.

64.    Contrariwise, most adult critical care codes are time-based, i.e., the coding entry indicates to the government how much time the provider spent providing the care being billed.

65.    Since time is not a factor in billing neonatal/pediatric critical care, only one practitioner can bill for care each day, i.e., if two practitioners billed for the same patient on a particular day, the government would pay double what it should have paid.

66.    A second important difference between neonatal and adult critical care billing codes involves "bundled" codes.  A code is bundled when two or more episodes of care are billed under a single code.  Compared to adult invasive procedure coding, there are many more invasive neonatal procedures which are bundled.  For example, the following procedures can never be billed separately in conjunction with the 24-hour bundled code:

- Arterial catheterization (CPT 36140, 36620)

- Umbilical venous and arterial catheterization (CPT 36510, 36660)

20

- Central vessel catheterization (CPT 36555)

- Venipuncture, including scalp sites (CPT 36400, 36405, 36406)

- Endotracheal intubation (CPT 31500)

- Surfactant administration (CPT 94610)

- Continuous positive airway pressure (CPAP) and ventilator management (CPT 94660, 94002-94004)

- Transfusion of blood products (CPT 36430, 36440)

- Suprapubic bladder aspiration and bladder catheterization (CPT 51100, 51701, 51702)

- Lumbar puncture (CPT 62270)

67.     The fact that neonatal/pediatric critical care billing codes are only used once each 24 hours and include a larger number of procedures affords them higher reimbursement value.

68.     Other important billing codes that can be billed separate from the neonatal critical care code, when caring for a newborn include:

- 99464: Attendance at delivery when requested along with initial stabilization of newborn, or

- 99465: Attendance at delivery along with provision of positive-pressure ventilation and/or chest compressions

69.     Services provided to a neonate (0-28 days) who requires intensive care (defined as intensive observation and frequent interventions but not critical care) can be billed utilizing the following billing codes:

- 99477:  Initial hospital care, 28 days and younger, all weights

- 99478:  Subsequent intensive care, present weight < 1,500 grams

- 99479:  Subsequent intensive care, present weight, 1,500-2,500 grams

- 99480:  Subsequent intensive care, present weight > 2,500 grams

21

2. **Global Bundled Surgical CPT Codes Used in Neurosurgery, Cardiology, Urology, and ENT Departments**

70.    Medicare payment for surgery typically is a single payment for preoperative, intra-operative, and post-operative services (for either zero, ten, or ninety days).[7]

71.    This single payment for a series of services is commonly referred to as a "global surgical package."[8]

72.    The three types of global surgical packages based on the number of postoperative days are:[9]

- **Zero Day Post-operative Period, (endoscopies and some minor procedures).**
  - No pre-operative period
  - No post-operative days
  - Visit on day of procedure is generally not payable as a separate service

- **10-Day Post-operative Period, (other minor procedures).**
  - No pre-operative period
  - Visit on day of the procedure is generally not payable as a separate service
  - Total global period is 11 days. Count the day of the surgery and 10 days following the day of the surgery.

- **90-day Post-operative Period, (major procedures)**
  - One day pre-operative included
  - Day of the procedure is generally not payable as a separate service
  - Total global period is 92 days. Count 1 day before the day of the surgery, the day of surgery, and the 90 days immediately following the day of surgery

---

[7] Physicians in the same group practice who are in the same specialty must bill and be paid as though they were a single physician. *Medicare Claims Processing Manual*, Chapter 12, Sections 40 and 40.1, at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the Centers for Medicare & Medicaid Services (CMS) website.

[8] Other names for the global surgical package include: global period, global services, surgical period, global package and global surgery.

[9] *Medicare Claims Processing Manual*, Chapter 12, Sections 40 and 40.1, at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

73.     The Medicare Physician Fee Schedule ("MPFS") provides information on each procedure code, including the global surgery indicator.

74.     Medicare includes the following services in the global surgery payment, i.e., these services cannot be billed separately:[10]

- Pre-operative visits after the decision is made to operate. For major procedures, this includes preoperative visits the day before the day of surgery. For minor procedures, this includes pre-operative visits the day of surgery;

- Intra-operative services that are normally a usual and necessary part of a surgical procedure;

- All additional medical or surgical services required of the surgeon during the post-operative period of the surgery because of complications, which do not require additional trips to the operating room;

- Follow-up visits during the post-operative period of the surgery that are related to recovery from the surgery;

- Post-surgical pain management by the surgeon;

- Supplies, except for those identified as exclusions; and

- Miscellaneous services, such as dressing changes, local incision care, removal of operative pack, removal of cutaneous sutures and staples, lines, wires, tubes, drains, casts, and splints; insertion, irrigation and removal of urinary catheters, routine peripheral intravenous lines, nasogastric and rectal tubes; and changes and removal of tracheostomy tubes.

75.     The following services are not included in the global surgical payment, i.e., these services may be billed separately:[11]

- Initial consultation or evaluation of the problem by the surgeon to determine the need for major surgeries. This is billed separately using the modifier -57 (Decision for Surgery). This visit may be billed separately only for surgical procedures.

---

[10]*Medicare Claims Processing Manual*, Chapter 12, Section 40.1, at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

[11]*Medicare Claims Processing Manual*, Chapter 12, Section 40.1, at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

- Services of other physicians related to the surgery, except where the surgeon and the other physician(s) agree on the transfer of care. This agreement may be in the form of a letter or an annotation in the discharge summary, hospital record, or ASC record (Note: The initial evaluation for minor surgical procedures and endoscopies is always included in the global surgery package. Visits by the same physician on the same day as a minor surgery or endoscopy are included in the global package, unless a significant, separately identifiable service is also performed. Modifier -25 is used to bill a separately identifiable evaluation and management (E/M) service by the same physician on the same day of the procedure.);

- Visits unrelated to the diagnosis for which the surgical procedure is performed, unless the visits occur due to complications of the surgery;

- Treatment for the underlying condition or an added course of treatment which is not part of normal recovery from surgery;

- Diagnostic tests and procedures, including diagnostic radiological procedures;

- Clearly distinct surgical procedures that occur during the post-operative period which are not reoperations or treatment for complications (Note: A new post-operative period begins with the subsequent procedure. This includes procedures done in two or more parts for which the decision to stage the procedure is made prospectively or at the time of the first procedure.);

- Treatment for post-operative complications requiring a return trip to the Operating Room (OR). An OR, for this purpose, is defined as a place of service specifically equipped and staffed for the sole purpose of performing procedures. The term includes a cardiac catheterization suite, a laser suite, and an endoscopy suite. It does not include a patient's room, a minor treatment room, a recovery room, or an intensive care unit (unless the patient's condition was so critical there would be insufficient time for transportation to an OR);

- If a less extensive procedure fails, and a more extensive procedure is required, the second procedure is payable separately;

- Immunosuppressive therapy for organ transplants; and

- Critical care services (Current Procedural Terminology (CPT) codes 99291 and 99292) unrelated to the surgery where a seriously injured or burned patient is critically ill and requires constant attendance of the physician.

76.   Physicians who furnish the surgery and furnish all of the usual pre-and post-operative work may bill for the global package by entering the appropriate CPT code for the surgical procedure only.  Separate billing is not allowed for visits or other services that are included

in the global package. When different physicians in a group practice participate in the care of the patient, the group practice bills for the entire global package if the physicians reassign benefits to the group. The physician who performs the surgery is reported as the performing physician.[12]

77.     More than one physician may furnish services included in the global surgical package.  For example, one physician may perform the surgical procedure, and a second physician furnishes the follow-up care. Payment for the postoperative, post-discharge care is split among two or more physicians where the physicians agree on the transfer of care. When more than one physician furnishes services that are included in the global surgical package, the sum of the amount approved for all physicians may not exceed what would have been paid if a single physician provided all services, except where stated policies allow for higher payment.

78.     For instance, when the surgeon furnishes only the surgery and a physician other than the surgeon furnishes pre-operative and post-operative inpatient care, the resulting combined payment may not exceed the global allowed amount. The surgeon and the physician furnishing the post-operative care must keep a copy of the written transfer agreement in the beneficiary's medical record.

79.     Where a transfer of care does not occur, the services of another physician may either be paid separately or denied for medical necessity reasons, depending on the circumstances of the case. Split global-care billing does not apply to procedure codes with a zero day post-operative period.[13]

---

[12]*Medicare Claims Processing Manual*, Chapter 12, Sections 40.2 and 40.4, *at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

[13]*Medicare Claims Processing Manual*, Chapter 12, Sections 40.1, 40.2, and 40.4, *at* http://www.cms.gov/Regulationsand-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

80.    Where physicians agree on the transfer of care during the global period, services must be distinguished by the use of the appropriate modifier:

- Surgical care only (modifier "-54"); or

- Post-operative management only (modifier "-55").

81.    The physician must use the same CPT code for global surgery services billed with modifiers "-54" or "-55." The same date of service and surgical procedure code should be reported on the bill for the surgical care only and post-operative care only. The date of service is the date the surgical procedure was furnished. Modifier "-54" indicates that the surgeon is relinquishing all or part of the post-operative care to a physician.

- Modifier "-54" does not apply to assistant-at surgery services.

- Modifier "-54" does not apply to an Ambulatory Surgical Center (ASC's) facility fees.

82.    The physician, other than the surgeon, who furnishes post-operative management services, bills with modifier "-55."

- Use modifier "-55" with the CPT procedure code for global periods of 10 or 90 days.

- Report the date of surgery as the date of service and indicate the date care was relinquished or assumed. Physicians must keep copies of the written transfer agreement in the beneficiary's medical record.

- The receiving physician must provide at least one service before billing for any part of the postoperative care.

- This modifier is not appropriate for assistant-at surgery services or for ASC's facility fees.[14]

---

[14]*Medicare Claims Processing Manual*, Chapter 12, Sections 40.2 and 40.4, *at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf on the CMS website.

83.     Where a transfer of care does not occur, occasional post-discharge services of a physician other than the surgeon can be billed under an appropriate code, typically an "evaluation and management" ("E/M") code.   No modifiers are necessary on the claim. Physicians who provide follow-up services for minor procedures performed in emergency departments bill the appropriate level of E/M code, without a modifier. If the services of a physician, other than the surgeon, are required during a post-operative period for an underlying condition or medical complication, the other physician reports the appropriate E/M code. No modifiers are necessary on the claim. An example is a cardiologist who manages underlying cardiovascular conditions of a patient.

**D.     Billing for Hospitalists, Residents, Physician Assistants ("PA") and Nurse Practitioners ("NP")**

84.     At all times relevant to this Complaint, the NPs, PAs, hospitalists and residents referenced herein were not employees or contractors of any of the physician groups. Rather, they were employees of, and paid by, Christiana Care.  As such, costs associated with their employment were included in the hospital's cost reports.  Hospital cost reports are used by the government to, *inter alia,* determine how much Christiana gets paid for providing hospital services to patients.

85.     Thus understood, when the government is separately billed by a private physician for work performed by an employee, the government is essentially paying twice for one service. That is particularly true with regard to residents, as Christiana received individual payments from the government for expenses related to each resident.

## VI.    THE FALSE CLAIMS ACT VIOLATIONS

### A.    The Kickback and Stark Schemes

#### 1.    Christiana Provided Remuneration to Private Physician Groups To Induce Referrals of Patients

##### a.    Remuneration in the Form of Free Services

86.    Defendants' inpatient beds and NICU basinets are filled predominantly by referrals from private doctors.  Thus, Defendants are financially dependent on referrals from local doctors and private practices.

87.    Sometime before 2010, Defendants and its management developed a scheme to funnel referrals to Christiana.  This scheme specifically relates to: (1) the NICU located in Christiana Hospital and private neonatology groups, (2) the Pediatrics/Neonatology Department located in the Christiana Hospital and private neonatology groups, (3) the Cardiovascular Surgery Department located in the Christiana Hospital and private cardiovascular surgery groups, (4)the Neurosurgery Department located in the Christiana Hospital and private neurosurgery groups; (6) the ENT Department located in the Wilmington Hospital and private ENT groups, and (7) the Urology Department located in the Helen F. Graham Cancer Center and private urology groups.

88.    In general, the scheme involved Christiana staffing its hospitals with hospitalists,[15] nurse practitioners and physician assistants to perform various medical services.  Christiana then entered into agreements with outside private surgical groups to perform procedures who eventually billed bundled codes to government healthcare programs for providing the care.  However, the outside physicians were not providing all of the services that were being billed to government

---

[15] Hospitalists are doctors who work for and are paid by the hospital to perform a variety of medical services.  For example, these doctors often perform "rounds" on patients of private physicians who are unable or unwilling to perform those rounds themselves.

healthcare programs.  Instead, the hospital-employed staff were providing many of these services. In exchange for the ability to bill government healthcare programs the bundled services codes without performing the services, the outside surgical groups referred patients to Christiana.

### i.      Kickbacks from Christiana Hospital NICU to Neonatology Associates

89.      As stated above, Christiana Hospital is a high risk delivery hospital offering a Level III Neonatal Intensive Care Unit.

90.      At all relevant times, this NICU had anywhere from 40-60 basinets that were consistently full.  More than 50% of the basinets were filled by Medicaid patients.

91.      Neonatology Associates was a private neonatology practice in Delaware until 2014.

92.      From before 2010 until the end of 2014,[16] Neonatology Associates had a contract with Christiana Hospital to provide services in the NICU.  This was an exclusive contract, i.e., the only private doctors practicing in the NICU were Neonatology Associates' doctors.   Pursuant to this exclusive agreement, Neonatology Associates, through its own billing department, billed government payers for the 24 hour NICU coverage codes set forth above, and received 100% of the reimbursements.

93.      Rhonda Mullins is a compliance auditor at Christiana.  She is a healthcare coding expert with more than 20 years of experience.

94.      In late 2010, Ms. Mullins was approached by Dr. Laura Lawler.  Dr. Lawler's title was Assistant Director of Pediatrics and she had been a pediatrician specializing in neonatology at Christiana for many years. She spent a substantial amount of her time providing services in the NICU, both before and after assuming the Assistant Directorship.

---

[16] In 2014, the physicians at Neonatology Associates became employees of Christiana Hospital.

29

95.     Dr. Lawler reported her concerns to Ms. Mullins and the Relator regarding the manner in which the NICU was being operated.  Specifically, she was distressed over the fact that Christiana employees were doing most of the work in the NICU, and that Christiana was refraining from billing for that work so that Neonatology Associates could bill the bundled 24 hour codes. Moreover, she viewed this to be an illegal and unfair provider compensation arrangement.

96.     Ms. Mullins was concerned about this scenario due to, *inter alia*, the fact that it appeared to violate the AKS and Stark.  Ms. Mullins and Dr. Lawler met more than a dozen times to go over various aspects of the alleged illegal conduct.

97.     In or around the first quarter of 2011, Ms. Mullins conducted what is commonly known in the field as a "chart audit."  A chart audit involves a comprehensive review of individual patients' medical files, including all tests, progress notes, surgical reports, etc.

98.     After concluding the audit, Ms. Mullins notified the Relator – then-Christiana's the Chief Compliance Officer – of her findings.

99.     Specifically, she advised the Relator that the chart audit revealed that doctors at Neonatology Associates were not performing most of the services they were billing for; rather, the services were being provided by Christiana employees.

100.    In fact, according to the written records, it appeared that the Neonatology Associates doctors had not been called, were not personally present, and were not consulted with for any part of many of the treatment or procedures being performed by, *inter alia,* the NPs and hospitalists in the Christiana Hospital NICU.

101.    Ms. Mullins also conducted a billing audit with regard to these patients which involved, *inter alia*, sitting with the individual physicians from Neonatology Associates any physically reviewing patient charts (and the associated billing codes) to assess whether the

physicians' billing to government payers was substantiated by the documentation in the chart. Thus, Ms. Mullins knew precisely which codes were being billed by each private physician she reviewed, even though their bills were not being generated from Christiana.

102.    Through this effort, Ms. Mullins confirmed that Neonatology Associates was billing the global bundled 24-hour code to government payers, including Medicaid, and that Christiana was not billing for the services its employees were providing.  In other words, Christiana provided free services to Neonatology Associates, and Neonatology Associates falsely billed the government for services it did not render.

103.    Although Christiana was not billing for the individual services and evaluations provided by its employees, Christiana was billing government payers, including Medicaid, for facility charges.

104.    Stated differently, there were two bills submitted to government payers for each of the infants present in the NICU.  One bill was from Neonatology Associates for professional services performed by its medical providers (e.g., medical evaluations).  The other bill was from Christiana for providing the facilities, equipment, and staff in the NICU.

105.    The bills submitted by Christiana violated the FCA and the DE FCA, because they were tainted by the hospital's violations of the AKS and Stark.

106.    The bills submitted by Neonatology Associates were false for the same reason, and for an additional reason:  Neonatology Associates did not perform most of the work for which it billed.

107.    Several of the global/bundled codes that Neonatology Associates used to falsely bill government payers, including Medicaid, appear below:

    a.   Neonatal inpatient critical care (0 -28 days), first day:  CPT 99468

31

    b.   Neonatal inpatient critical care (0 -28 days), each subsequent day: CPT 99469

    c.   Pediatric inpatient critical care (29 days – 24 months), first day: CPT 99471

    d.   Pediatric inpatient critical care (29 days – 24 months), each subsequent day: CPT 99472.

108.    In addition to the above findings, Ms. Mullins found deficient progress notes and/or inadequate or missing evaluation and medical management notes that can be categorized as follows: (a) the complete absence of neonatologist documentation in chart; (b) NP/hospitalist notes that were merely countersigned by the neonatologist(s), with no separate note from neonatologist(s); and (c) separate notes from the neonatologist consisting largely of a countersignature or a note stating "agree with above" and referencing the Christiana employees' notes.  These deficiencies rendered these charts woefully short of meeting the documentation requirements set by the government.  *See, e.g.,* 42 C.F.R. §415.172.

109.    The Relator led an internal compliance investigation into this matter.  The investigation revealed that the Neonatology Associates doctors were so commonly "unavailable" that hospital employees simply substituted for them in providing the required medical management and treatment of infants.

110.    The investigation further revealed that when emergent or unusually complex cases arose on off-hours, the neonatologists were called and gave telephone advice, but rarely came in. This was the case even when the presence of a specialist for supervision purposes was clearly warranted by existing law.

111.    The investigation also revealed that while the neonatologists did make visits to the NICU to review their cases, they rarely wrote their own notes on treatment/procedures requiring

their personal involvement, and when they did their documentation was inadequate substantiate the billing of a 24 hour coverage code.

112.    Despite the fact that hospital-employed medical professionals performed much of or most of the care provided in the NICU, Christiana did not bill for those professional services, nor did they bill for the 24-hour bundled NICU code.  Instead, Neonatology Associates billed for the services provided by Christiana.

113.    Subsequent to Ms. Mullins bringing this situation to the attention of the Relator, Relator had telephone conversations with Dr. Lawler to get more details and to corroborate Ms. Mullins findings. Dr. Lawler then offered to draft a memorandum with the details and send it to the Relator and Christiana's Chief Executive Officer at the time, Dr. Robert Laskowski, which she did in early 2010.

114.    The memorandum corroborated Ms. Mullins findings and described in detail the illegal practices which had become common in the NICU.  Dr. Lawler's memorandum also provided the names of several other NICU staff who were aware of the issues and were upset by the conduct.

115.    The same day as he reviewed Dr. Lawler's memorandum, Dr. Laskowski called the Relator to discuss the issues presented by the memorandum and requested that the Relator set up an internal executive staff meeting to determine steps going forward and organize a response to the situation. In that conversation, Dr. Laskowski expressed substantial concern about the allegations and implied that they presented legal risk to the hospital by saying "Ron, if there was ever a whistleblower case, this is it."

116.    The Relator thereafter met with Dr. Lawler and Ms. Mullins on two occasions to further discuss the allegations, to reassure her that the Compliance Department intended to work to resolve her concerns, and that the Compliance Department was serious about fixing the problem.

117.    Additionally, the Relator and Ms. Mullins conducted an unannounced informal visit to the NICU in an attempt to get an objective impression of who was providing day-to-day care/treatment in the NICU, and to better understand how consults are requested, how emergency situations are handled, how activities are documented, etc.

118.    During the visit, Ms. Mullins showed the Relator examples of Medicaid patient charts that corroborated her findings.  The Relator and Ms. Mullins also interviewed various NICU employees.  The charts and the interviews with employees confirmed Dr. Lawler's allegations and the findings of Ms. Mullins' previous audit, i.e., that Christiana employees were performing services and that Neonatology Associates was billing the government for that care.

119.    The executive staff meeting requested by Dr. Laskowski was held shortly after the Relator and Ms. Mullins visited the NICU.  The meeting included Dr. Laskowski, the Relator, Christiana's outside counsel, COO Gary Ferguson, CFO Tom Corrigan, Chair of Pediatrics Dr. Lou Bartoshesky, and General Counsel Brenda Pierce.

120.    Subsequent to this meeting, a formal meeting was held with Neonatology Associates and their attorney.  That meeting included the head of the Neonatology Associates, Dr. John Stefano, Neonatology Associate's attorney, Christiana's General Counsel Brenda Pierce, Christiana's outside counsel, the Relator and Ms. Mullins.  The subjects of the meeting were the AKS and Stark implications of the financial arrangement between Neonatology Associates and Christiana, as well as Dr. Lawler's memorandum (which was circulated among the meeting participants).

34

121.    At the meeting it was agreed that an expert neonatology coding consultant would be retained to review a sample of the Christiana NICU charts and to opine on whether the relationship between the Neonatology Associates and Christiana violated the law.

122.    To the best of the Relator's recollection, Christiana engaged Gail I. Smith for this purpose.  Ms. Smith is a healthcare consultant with more than 30 years of experience in the industry.  She is a certified coding specialist for physicians, and the author of numerous CPT coding publications.

123.    The consultant's assignment was to review a sample of NICU charts, including a careful review of the content of chart progress notes and other notes of evaluations, treatment and procedures in the NICU, as well as the authorship and sequencing of notes, to determine if there was evidence that hospital employees were in fact performing the care required to be performed by the neonatologists to justify their billing 24 hour bundled codes.  The consultant's conclusion was that Dr. Lawler's allegations were credible, and that the arrangement between Christiana and Neonatology Associates presented considerable risk of a government enforcement action.  These findings were articulated in a written report.

124.    That report was subsequently shared with Neonatology Associates.  Neonatology Associates rejected the report, claiming the consultant was not qualified because the consultant was not a physician.  Neonatology Associates demanded that a physician review and provide an opinion on the arrangement.

125.    The second consultant, who was identified/found by Neonatology Associates, was Dr. Richard Molteni.  Dr. Molteni was a neonatologist with considerable NICU expertise, but he was not an expert in medical record auditing or coding.  Not surprisingly, Dr. Molteni focused on

the quality of care in the NICU and found that there were no serious issues with the arrangement between Neonatology Associates and Christiana.

126.    After Christiana reviewed the findings of the consultants, there were several discussions among the executives regarding the calculation and submission of a refund to the government for claims resulting from all "tainted" referrals received by Christiana Hospital from Neonatology Associates during the multi-year period the arrangement existed with the group. It was decided, although not universally agreed upon, that no refund would be calculated or submitted, nor would any disclosure would be made.

127.    Ultimately, no refund was ever provided to the government healthcare programs in question, including Medicaid.  In addition to the FCA and DE FCA violations outlined above, the failure to return these overpayments specifically violates the "reverse false claims" provisions of the FCA and the DE FCA.  *See, e.g.*, 31 U.S.C. §3729(a)(1)(G).

### ii.    Additional, Similar Kickback/Stark Violations Involving the Neurosurgical Unit and the Heart Center

128.    As the substance of the Relator's neonatology investigation slowly became known to Christiana employees, the Relator and Ms. Mullins were contacted by various practitioners regarding similar arrangements in other hospital departments (i.e., departments other than neonatology).  Subsequently, the Relator and Ms. Mullins investigated whether these other practice areas were involved in relationships which similarly violated the AKS, Stark, the FCA, and the DE FCA.

129.    Christiana's neurologic and spine surgery practice ("Neurosurgical Unit" or "Neurosurgical Critical Care Unit") is located on the Christiana Hospital campus.  There, private neurosurgeons perform procedures to treat a variety of conditions including, stroke, tumor

embolizations, brain aneurysms, carotid and intracranial stenting, herniated discs, spinal stenosis, tumors and spinal-cord injuries, etc.

130.    Also located at the Christiana Hospital campus is the Christiana Care Center for Heart & Vascular Health ("Heart Center").  At the Heart Center, private cardiovascular surgeons perform a wide range of cardiac procedures including surgery, vascular surgery, vascular interventional radiology, cardiology and interventional nephrology.  Christiana reports that the Heart Center treats more than 8,000 total heart and vascular cases annually, including nearly 600 open-heart procedures.

131.    As described below, at varying times subsequent to the neonatology investigation, the Relator was presented with evidence that there were kickback arrangements between Christiana and other private surgical groups.  Stated succinctly, in return for referrals, these surgical groups were receiving the same type of free services that Christiana provided to Neonatology Associates.

132.    More specifically, private surgical groups including CC Cardiology Consultants, Cardiology Physicians, PA, and the Delaware Neurosurgical Group, PA, were being engaged by Christiana to perform surgeries at the Heart Center and Neurosurgical Unit, respectively.

133.    Before surgeries were performed by these attending physicians, Christiana employees performed pre-operative care at no cost to the physicians.

134.    After surgeries were performed by the attending physicians, Christiana employees performed post-operative care, including consults, evaluations, post-operative notes, and medical management, again at no cost to the doctors.

135.    Additionally, Christiana employees from one surgical service performed consultations requested by a different surgical service without the attending physician's

involvement at any level, and without a separate consultation note supporting the billing of a global/bundled surgical code.

136.    In exchange for the referral of patients, Christiana refrained from submitting claims to government healthcare programs for work done by its employees so that these surgical groups could bill bundled codes for these services, even though they did not perform most of the pre-or post-operative work for which they were billing.

137.    In or about the end of 2012, Ms. Mullins reviewed a sample of charts of both neurosurgical and cardiovascular patients, including patients in the Neurosurgical Critical Care Unit and the Cardiovascular Critical Care Unit. The documentation reflected that Christiana-employed providers were performing pre and post-operative care, including consults, medical evaluations, and writing comprehensive post-operative notes.[17]  Ms. Mullins' investigation also revealed that the outside private surgical groups were billing the government global bundled codes for the care provided by Christiana employees, and that Christiana was not billing for that care.

138.    After Ms. Mullins brought these issues to the Relator's attention, the Relator held a formal meeting to discuss the billing of the global bundled codes by outside surgical groups who did not provide the treatment.  In attendance were the Relator, Chair of General Surgery-Gerry Fulda, Chair of Cardiovascular Surgery-Tim Gardner, Chair of Neurosurgery-Mike Epply, Former Chair of Surgery-Mike Rhodes, CMO-Janice Nevin, CFO-Tom Corrigan, COO-Gary Ferguson, General Counsel-Brenda Pierce, Christiana's outside counsel, and Rhonda Mullins.

139.    At the meeting – which was held at the end of 2012 – the executives developed 6 overarching Rules designed for the entire surgery department (and to serve as the foundation for

---

[17] Although these notes were often subsequently reviewed and approved by the surgeon, Ms. Mullins found that the physicians were not involved in the care itself.

other policies).   These Rules were (purportedly) designed to immediately put an end to any

potential violations within the entire surgery department.   The Rules effectively constituted a

"corrective action plan" ("CAP") for these violations:

1. Private attending physicians may not request routine post-operative consults, even when their patients are recovering in a Christiana ICU, because such consults are covered by global surgery codes;

2. Any other consults requested must be for medical management unrelated to any services covered by a global/bundled fee;

3. Christiana employed NPs or PAs may perform surgical follow up services and/or write daily progress notes for private patients but their work or documentation may not substitute for the work or documentation of a private attending physicians or a PA employed by an attending;

4. Private surgeons must dictate at least one comprehensive post-operative note to satisfy Medicare global surgical payment requirements;

5. If a Christiana employed NP/PA performs part of a consultation requested by another service, the attending must also provide his/her portion of the consultation and dictate his/her own consultation note; and

6. Attendings must themselves document patient evaluations and not simply co-sign NP/PA note or write "agree with above."

140.   After the meeting, the compliance department – headed by the Relator – tasked

surgical department managers with drafting and/or implementing the Rules or other policies

derived from them.

141.   The Relator can state that to his knowledge, none of the policies were effectively

implemented, and the conduct described above continued unabated.

### iii.   Additional, Similar Kickback/Stark Violations Involving the Urology and ENT Departments

142.   In the beginning of January 2014, the Relator became aware of the same scheme

occurring at Christiana's Urology and ENT departments.   More specifically, outside private

surgical groups were billing bundled global codes for pre- and post-operative care occurring in

Christiana's Urology and ENT departments, but were not performing the care; rather, the care was being performed by Christiana employees.

143.    The ENT Department ("Ear, Nose and Throat") or "Sinus Surgery Center" is located on the Wilmington Hospital campus.

144.    The Urology Department, which evaluates and manages all types of urologic disease, is located at the Christiana Hospital campus and in the Helen F. Graham Cancer Center.

145.    The two major private urology and ENT groups associated with Christiana are Brandywine Urology Consultants and ENT and Allergy of Delaware.

146.    Compliance Program Manager Christine Babenko found numerous examples of progress notes, consultation notes, and comprehensive evaluation notes from these two departments that had only the signature of a hospital employee, i.e., there was no evidence that the outside surgeon ever personally saw the patients or was involved at all with their care; instead the care was provided by Christiana employees.

147.    Other notes merely contained the co-signature of a surgeon under the hospital employed NP or PA's note; sometimes the signature would appear under the words "agree with above." Some notes lacked any description of the surgeon's personal involvement in the "critical portion" of the services, which is often required for the surgeon to bill a global/bundled fee for Medicare/Medicaid patients.

148.    Based on her findings, Ms. Babenko directed the Relator to Bernie Racey (Chief PA for Surgery).  Mr. Racey corroborated Ms. Babenko's finding, i.e., he informed the Relator that the hospital-employees were performing work being billed by private Urologic and ENT surgeons.  On a more personal note, Mr. Racey reported that many PAs who actually performed the work felt overburdened by these duties, as well as anxious about the lack of physician

40

involvement in the care of the patients, particularly when emergent situations arose and these non-doctors were forced to provide sophisticated medical care they considered "above their heads."

149.    Mr. Racey went as far as to show the Relator the medical records which substantiated the allegations.  There were even records demonstrating that PAs were substituting for private physicians when these physicians were scheduled to be "on call" to one or more of Christiana's Emergency Departments. Often PAs would handle all of the specialty care required by the emergency.  If the Emergency Department physician demanded the appearance of the on-call private surgeon, the surgeons often resisted appearing.

150.    As a consequence of these findings, the Relator, Ms. Babenko, and Mr. Racey had several conference calls and at least two in-person meetings with Gerry Fulda, the Chief of Surgery at Christiana.

151.    A Corrective Action Plan was developed in an attempt to eliminate the violations. Dr. Fulda was to meet with the surgeons involved, discuss individual situations, discuss the proper use of PAs and NPs, emphasize the 6 Rules on PA/NP consults (set forth above), and require the development of policies particular to each department if necessary.

152.    The Relator offered to meet with each department to discuss the law and Christiana's requirements relating to the proper use of PAs and NPs, and to discuss emergency call and individual problems related thereto.

153.    The CAP was intended to be ongoing until a further audit of records demonstrated compliance. The Urologic and ENT surgical groups resisted the changes required by the CAP because they had become used to the quality of life they could achieve by billing for the free services provided by hospital employees, while at the same time spending minimal time rounding on their patients and taking emergency call.

154.    Dr. Fulda stated that he met with the Chiefs of both Urology and ENT to discuss the CAP.  The Relator also had separate meetings with the Chiefs to educate them on surgeon supervision requirements, documentation requirements, and on-call responsibilities.

155.    Instead of acknowledging the legal implications of these arrangement, many of the physicians got angry with the Relator for "interfering" with their relationship with the hospital.

156.     A few months prior to the end of 2014, Dr. Laskowski announced his retirement as CEO of Christiana, effective the last day of 2014.  This led the Board to commence a search for a new CEO.

157.    The Board eventually chose Dr. Janice Nevin, the then-CMO (Chief Medical Officer) of Christiana, to succeed Dr. Laskowski as CEO.

158.    During his tenure at Christiana, the Relator observed that Dr. Nevin was extremely protective of private attending physicians over her long history of representing them.  The Relator perceived that Dr. Nevin eventually came to view the Relator as a threat to the Medical Staff, due to his knowledge of the Anti-Kickback and FCA violations alleged above, and his efforts to bring Christiana into compliance.

159.    Dr. Nevin summarily terminated the Relator from his position, effective December 28, 2014.

160.    Dr. Nevin used a false pretext for the meeting at which the Relator was terminated, and she prevented the Relator from returning to his office thereafter in order to ensure that the Relator would have in his possession as little written documentation as possible to support his allegations.

161.    Dr. Nevin began the meeting, which was attended by Christiana's VP for Human Resources, by indicating that the Relator was to be dismissed effective immediately, that he would

be prevented from returning to his office by Christiana Security Staff, and that his personal belongings would be brought down to him by Security Staff.

162.    Thus, for purposes of the allegations above, the Relator is currently in possession of very few written documents that can be used as tangible evidence to support his allegations. However, the Relator knows the locations of the offices and files on Christiana premises where these documents were kept, as well as the persons who were in control thereof, at the time the Relator was escorted from the Christiana campus.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §3729(A)(1)(A)

163.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

164.    Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

165.    By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §3729(a)(1)(B)

166.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

167.    Defendants knowingly caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records

or statements caused the submission of false and inflated claims to the United States in violation of 31 U.S.C. §3729(a)(1)(B).

168.     By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III
## FEDERAL FALSE CLAIMS ACT
### 31 U. S.C. §3729(a)(1)(G)

169.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

170.     Defendants knowingly made or used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States.

171.     By virtue of the above, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV
## FEDERAL FALSE CLAIMS ACT
### 31 U. S.C. §3729(a)(1)(C)

172.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

173.     Through these acts, Defendants conspired with others to commit violations of the FCA as alleged herein.  By virtue of this conspiracy, the United States has suffered actual damages.

## COUNT V
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## DEL CODE ANN. TIT. 6, §1201(A)(1)

174.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

175.    Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of Del Code Ann. Tit. 6, §1201(a)(1).

176.    By virtue of the false or fraudulent claims that Defendants presented, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VI
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## DEL CODE ANN. TIT. 6, §1201(A)(2)

177.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

178.    Defendants knowingly caused to be made or used, false records or statements material to false or fraudulent claims to the State of Delaware.  Defendants' false records or statements caused the submission of false claims to the State of Delaware in violation of Del Code Ann. Tit. 6, §1201(a)(2).

179.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VII
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## DEL CODE ANN. TIT. 6, §1201(A)(7)

180.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

181.    Defendants knowingly made or used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the State of Delaware, or Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Delaware.

182.    By virtue of the above, the State of Delaware has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VIII
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## DEL CODE ANN. TIT. 6, §1201(A)(3)

183.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184.    Through these acts Defendants conspired to commit violations of the Act in violation of Del Code Ann. Tit. 6, §1201(a)(3).  By virtue of this conspiracy, the State of Delaware has suffered actual damages.

## REQUESTS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars

($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a).

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.


Dated: April 12, 2017

                              BERGER & MONTAGUE, P.C.

                         By: _____
                              Daniel R. Miller (DE Bar #3169)
                              Shauna B. Itri
                              1622 Locust Street
                              Philadelphia, PA 19103
                              (215) 875-3000


                              *Attorneys for Relator*