## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF DELAWARE *ex rel.* Ronald Sherman,<br><br>            Plaintiffs,<br><br>      v.<br><br>CHRISTIANA CARE HEALTH SERVICES, INC., CHRISTIANA HOSPITAL, and WILMINGTON HOSPITAL,<br><br>            Defendants. | **C.A. No. 1:17-cv-00419-RGA**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL** |

## MEMORANDUM IN RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS RELATOR'S COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION

**BERGER MONTAGUE**
Daniel R. Miller (DE Id. #3169)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
dmiller@bm.net

*Attorney for Relator*

Dated: October 3, 2019

# TABLE OF CONTENTS

I.      SUMMARY OF THE ARGUMENT ................................................................. 1

II.     STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ............................. 2

III.    THE LAW ........................................................................................... 3

IV.     ARGUMENT ........................................................................................ 5

        A.      The Log Entries Do Not Provide Notice of Fraud. .................................. 5

        B.      The Log Entries Are Misleading ........................................................ 5

                1.      The NICU Allegations ............................................................. 5

                2.      Allegations Involving Other Practices ...................................... 13

        C.      Relator Was Terminated by Defendants Because They Saw Him as a
                Threat to Their Relationship with Referring Private Physicians. ................. 17

        D.      FCA Claims are Not Contemplated by the Agreement ............................ 19

        E.      Relator Has Complied with Delaware's False Claims Act. ....................... 20

V.      CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Gould Elec. Inc., v. United States,*
  220 F.3d 169 (3d Cir. 1977) ........................................................ 3

*Kehr Packages, Inc. v. Fidelcor, Inc.,*
  926 F.2d 1406 (3d Cir. 1991) ...................................................... 3

*United States ex rel. Radcliffe v. Purdue Pharma L.P.,*
  600 F.3d 319 (4th Cir. 2010) ...................................................... 4

*Town of Newton v. Rumery,*
  480 U.S. 386 (1987).................................................................... 3

*United States ex rel. Calilung v. Ormat Industries,*
  No. 3:14-cv-00325, [2016 WL 1298119] (D. Nev. Mar. 30, 2016) ..................................... 4, 5

*United States ex rel. Class v. Bayada Home Health Care, Inc.,*
  2018 WL 4566157 (E.D. Pa. Sept. 24, 2018) ............................. 4

*United States ex rel. Hall v. Teledyne Wah Chang Albany,*
  104 F.3d 230 (9th Cir. 1997) ...................................................... 4

*United States ex rel. Ladas v. Exelis, Inc.,*
  824 F.3d 16 (2d Cir. 2016) ......................................................... 4

*United States ex rel. Ritchie v. Lockheed Martin Corp.,*
  558 F.3d 1161 (10th Cir. 2009) .................................................. 4

**Statutes**

29 U.S.C. §1001 ................................................................................ 19

29 U.S.C. §2601 ................................................................................ 19

42 U.S.C. §§ 1320a-7b...................................................................... 2

6 Del. C. § 1203(b)(1)...................................................................... 20

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................................... 3

Ronald Sherman ("Relator") hereby submits this response and opposition to Christiana Care Health Services, Inc. ("CCHS"), Christiana Hospital, and Wilmington Hospital's (collectively referred to herein as "Defendants" or "Christiana") Motion to Dismiss Relator's Complaint for Lack of Subject Matter Jurisdiction and Defendant's supporting brief (D.I. 14, collectively "MTD")).

## I.      SUMMARY OF THE ARGUMENT

In their Motion to Dismiss, Defendants argue that Relator does not have standing to bring claims under the federal False Claims Act ("FCA") and Delaware False Claims Act ("DE FCA") because he signed a Separation Agreement that prohibits him from bringing claims related to his employment against Defendants.  In making this argument, Defendants allege that the same fraud allegations that form the foundation of Relator's FCA claims were disclosed to the government in compliance disclosure logs that Defendants submitted to the government pursuant to a Corporate Integrity Agreement ("CIA") Defendants entered as a result of an earlier False Claims Act case with the United States Department of Health and Human Services ("HHS").  The disclosures in the logs submitted pursuant to the CIA, Defendants argue, were "truthful and not misleading" (D.I. 19 at 15) and "explicitly informed the government" of the fraud alleged in the Complaint.  (D.I. 19 at 17).  Defendants reason that because the government knew of the fraud and could have pursued it, the release of claims contained in the severance agreement Relator signed after he was terminated and walked out of the building should be enforced.

However, an analysis of the CIA disclosure log entries, as well as documents that Defendants have produced in this case and that Relator has accumulated in his investigation, show that Defendants' disclosures were so divorced from Defendants' actual knowledge of the frauds alleged that the disclosures log entries were misleading and certainly did not alert the government to the

1

fraud that had occurred.  In fact, the disclosure log entries give the appearance that no fraud had occurred, when the opposite was true.

## II.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

In his Complaint, Relator alleges, *inter alia*, that Defendants violated the FCA and the DE FCA through a series of schemes in which Defendants provided private practice groups with free labor from Defendants' staff (*e.g.*, hospitalists, residents, and nurse practitioners' collectively referred to herein as "Staff and employees") to induce the private practice groups to refer their patients to Defendants.  (D.I. 1 at ¶ 14). Relator first became aware of this scheme occurring in one of Defendants' Neonatal Intensive Care Units ("NICU"), and later in Defendants' Neurosurgical, Cardiovascular, Ear, Nose and Throat ("ENT"), and Urological Surgery practices. (*Id*. at ¶ 14–15).  Relator's Complaint alleges that these arrangements violate of the Anti-Kickback Statute ("AKS"), 42 U.S.C. §§ 1320a-7b, and the Stark Law, 42 U.S.C. §§ 1320a-7b.

In its Motion to Dismiss, Christiana argues that certain disclosures it made in annual reports it filed with HHS as a result of a CIA it had entered in 2010 put the Government on notice of the fraud schemes that Relator alleges in his Complaint, and thus that the release Relator signed after being fired by Christiana should be enforced, barring him from bringing these claims.  The CIA that Christiana entered with HHS required Christiana to submit a "log" containing:

> a summary of the disclosures . . . required by Section III.F that: (a) related to Federal health care programs; (b) allege abuse or neglect of patients; or (c) involve allegations of conduct that may involve illegal remunerations or inappropriate referrals in violation of the Anti-Kickback Statute or Stark Law.

(D.I. 19, Ex. 2, CIA at 24.) According to Section III.F of the CIA, these included "any identified issues or questions associated with [Defendants'] policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual [reporting the disclosure] to be a potential violation of criminal, civil, or administrative law." (D.I.19, Ex. 2, CIA, at 14).  Thus,

2

the log contained a summary of all "issues or questions" actions **believed by the reporter** to be a potential violation.   Thus understood, frivolous and otherwise unsubstantiated claims were required to be included in the log.

Consistent with this understanding, Christiana has itself admitted that the log entries were not comprehensive, and instead were simply unsubstantiated allegations.   Specifically, when arguing that the CIA reports should remain sealed and not subject to public view, Christiana argued that "[t]he Logs, whose form is mandated by OIG, contain only unsubstantiated allegations, without context or refutation."   (D.I. 13 at ¶ 5).   Of course, now, in its MTD, Christiana alleges that the log entries "explicitly informed the government" of the fraud alleged in the Complaint, (D.I. 19 at 17), in a manner that was "truthful and not misleading." (D.I. 19 at 15).

Turning back to the CIA's requirements, it is important to note that Section III.F required Defendants to provide additional information outside of the disclosure log. Specifically, Christiana was required to inform OIG of "the status of [any] respective internal reviews, and any corrective action taken in response to the internal reviews." (D.I. 19, Ex. 2, CIA at 15).

## III.    <u>THE LAW</u>

When a factual attack on jurisdiction is made pursuant to Federal Rule of Civil Procedure 12(b)(1), a relator must establish by a preponderance of the evidence that the court has jurisdiction. *Gould Elec. Inc., v. United States*, 220 F.3d 169, 178 (3d Cir. 1977) (*citing Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

The jurisprudence on whether pre-filing releases are enforceable derives from the Supreme Court case of *Town of Newton v. Rumery*, 480 U.S. 386 (1987), which states that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id*. at 392.   The public policy recognized in FCA *qui tam* cases "is to 'set up incentives to supplement government enforcement' of the Act by

3

'encourag[ing] insiders privy to fraud on the government to blow the whistle on the crime.'" *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 233 (9th Cir. 1997) (internal citations omitted).

As this Court has recognized, "there is an emerging agreement among other circuits that such releases bar FCA claim if (1) the release can fairly be interpreted to encompass *qui tam* claims and (2) public policy does not otherwise outweigh enforcement of that release."  (D.I. 32 at 3) (*citing United States ex rel. Class v. Bayada Home Health Care, Inc.*, 2018 WL 4566157, at *5 (E.D. Pa. Sept. 24, 2018); *Radcliffe*, 600 F.3d at 319; *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161 (10th Cir. 2009); *United States ex. rel. Hall v. Teledyne Chang Albany*, 104 F.3d 230 (9th Cir. 1997)).

Further, "[u]nder the public policy prong of that approach, the release of claims signed by Realtor 'is enforceable if the Defendants' disclosures to HHS-OIG were sufficient to permit the government to investigate the purported fraud allegations within them."  (*Id*. at 4) (citing *Ritchie*, 558 F.3d at 1170; *Radcliffe*, 600 F.3d at 322).  As Defendants themselves admit, in order for a pre-release disclosure to be "sufficient to permit the government to investigate the purported fraud allegations," the disclosure "must comply with two requirements:"

> First, it must be truthful and not misleading.  *See, e.g., United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 24–25 (2d Cir. 2016) (refusing to enforce release where defendant's disclosure to the government contained an 'affirmative misrepresentation' about the crux of relator's allegations because "[n]othing in [defendant's disclosure] indicated to the government that there was any fraud or that anyone had alleged fraud").  Second, it must provide the government with "more than just notice of the facts involved" – it must state that fraud was alleged or actually occurred.  *United States ex rel. Calilung v. Ormat Industries*, No. 3:14-cv-00325, [2016 WL 1298119], at *10 (D. Nev. Mar. 30, 2016).

(D.I. 19, at 15–16).

4

IV.   <u>**ARGUMENT**</u>

A.   **The Log Entries Do Not Provide Notice of Fraud.**

In order to justify enforcing the release, a disclosure "must provide the government with 'more than just notice of the facts involved' – it must state that fraud was alleged or actually occurred." (D.I. 19, at 15–16, citing *Calilung,* 2016 WL 1298119, at *10). The disclosures Defendants point to here make no explicit reference to fraud, nor do they even allege that anything illegal occurred. (*See* D.I. 13 at 6–8). Each of the entries is framed as a potential billing irregularity caused by a group of private doctors; none of the entries discloses that Christiana was committing fraud by allowing their employees to perform free services for those doctors in exchange in referrals, which is the main thrust of Relator's allegations. As such, these disclosures fail the "allegation of fraud" prong of test Defendants themselves admit is applicable to this Court's analysis.

B.   **The Log Entries Are Misleading.**

1.   *The NICU Allegations*

The log entries even more clearly fail the "truthful and not misleading" prong of the applicable test. This is best illustrated by comparing what Christiana reported to the government regarding the situation NICU to what Christiana knew *but did not report* to the government.

It is undisputed that Christiana did not report the NICU situation to the government under Section III.F of the CIA, which required Defendants to provide "the status of [any] respective internal reviews, and any corrective action taken in response to the internal reviews." (D.I. 19, Ex. 2, CIA at 15). Instead, the only information provided by Christiana to the government regarding the situation in the NICU is this:

> Allegation by Medical Director of Pediatric Hospitalists that non-employed Neonatology Group bills and collects bundled payment from Medicaid for full time oversight coverage of NICU but relies

> on employed hospitalists and nurse practitioners to provide services that are required to be provided by the Group in order to bill the bundled code.

(D.I. 14, Ex. 3 at 1–2).[1]  Reading this single sentence fragment—and knowing that Christiana was obligated to report any follow up investigation under Section III.F—the Government would conclude that: 1) a single Christiana employee made an allegation relating to (potentially innocent) billing irregularities on the part of private attending physicians, and 2) no internal or external investigation was conducted to corroborate (or debunk) the allegation.  But as discussed below, the evidence shows that the opposite is true—Christiana did not tell the government that: 1) it believed the allegations required it to conduct an internal compliance audit, which concluded that Christiana was engaged in a kickback scheme, 2) it then decided to hire an external billing expert, who confirmed many of the findings of the internal audit, 3) Neonatologists Associates admitted that they had not been performing required examinations of babies admitted to the NICU, and that their physicians were not present in the NICU for between 18 to 21 hours each day, leaving Christiana employees to care for the babies in the NICU for the vast majority of the time, 4) the hospital debated whether to repay the proceeds of the scheme to the government but elected not to do so, and 5) all of this was discussed among Christiana's highest executives.

---

[1] This sentence fragment itself is misleading when compared to the source of the information contained in the sentence.  The "Medical Director of Pediatric Hospitalists" referenced in the disclosure is Dr. Laura Lawler.  Dr. Lawler's concerns are contained, *inter alia*, in a September 15, 2010 two page single-spaced email which is attached hereto as Exhibit A (CCHS-000474).  As the Court can see, Dr. Lawler's report to Christiana is far more detailed than the disclosure log entry and describes actual wrongdoing that violates CMS (i.e., government) guidelines.  A few of the highlights include: "Neonatologists bill for all procedures done in NICU;" "Procedures are almost always done by NNPs/residents/fellows;" "Patients are not examined by attending neos daily;" "Notes are not compliant with CMS, CPT, or PATH guidelines."  (Exhibit A at 1).  Moreover, the date of the email—September 15, 2010—comes two and a half months after the date on the disclosure log, indicating that Christian's internal discussions with Dr. Lawler continued well after June 29, 2010, the date of the disclosure log entry.

The misleading nature of the NICU log entry is even more evident when it is compared to other entries in the same log which contain extensive detail regarding follow up investigation(s) and other actions taken by Christiana.  For example, in the same CIA report that contained the threadbare sentence fragment regarding the NICU, Christiana reported the following relating to billing violations in the OB/GYN triage unit:

> 4/10/2010 Senior Compliance Auditor reports that audit of 53 OB/GYN Triage charts revealed gaps in documentation to support coding levels billed, contained, unsigned progress notes, lacked orders for FNST, labs and meds, in certain cases, and lacked proper teaching physician documentation to support billing.  Sample of 100 Medicaid charts was drawn by outside expert and audit was conducted.  Error rate found was extrapolated over 4 years and refund of $192,675 was calculated to return to Medicaid HMO.  However, CCHS has been unable to ascertain the appropriate recipient of the refund.  On the advice of Lee Penninger from the OIG, a separate account has been created to hold the funds until an appropriate recipient can be identified.

(D.I. 14, Ex. 3 at 1).  This report references the fact that there was an audit; it discusses how many charts were reviewed in the audit; it discussed what the auditor looked for in those charts; it discusses that an outside expert was then retained; that an error was determined; that from that error rate, an overcharge amount was determined; and that Christiana was in the process of determining to whom to return the funds.[2]  By providing greater detail about these other events, but presenting a very brief description of the issues surrounding the NICU, the disclosure log gives the appearance that all there was to report regarding the NICU was a single individual raising concerns that Neonatology Associates was potentially engaged in billing violations.

---

[2] Further to this point, in total, there were 21 events disclosed in the 2011 Annual Report log; eight of those entries refer to a "report" or an "audit," as opposed to mere "allegations" (entries for 4/10/2010, 5/4/2010, 6/29/2010, 7/12/2010, 7/15/2010, 10/1/2010, 12/6/2010, and 1/26/2011).  By providing greater detail about these other events, but presenting a very brief description of the issues surrounding the NICU, the disclosure log gives the appearance that all there was to report was a single "allegation" that Neonatology Associates was using bad billing practices.

In fact, by the date that Christiana submitted the disclosure log in question, in April of 2011, it had performed the same kind of in-depth analysis of the neonatology charts that it reported regarding the OB/GYN Triage charts, using both internal and external resources to do so. As these documents revealed, and as subsequent efforts confirmed, Christiana viewed its billing practices with regard to Neonatology Associates as violations waiting to be discovered, and it took steps to try to stop these illegal practices.

Specifically, with this Opposition, Relator submits a Declaration made under penalty of perjury from Christiana's then-Senior Compliance Auditor Rhonda Mullins.[3] The Declaration is attached hereto as Exhibit B.   As it relates to the NICU investigation, Ms. Mullins explains as follows:

> Once we identified the patients and the dates in question, we reviewed Christiana's billing for those patients and dates, i.e., we checked Christiana's facility-based billing. We also obtained the billing records for those same patients and dates from the Neonatologists, i.e., we obtained the codes the Neonatologists submitted for work they claimed to perform on the hospital's NICU patients.
>
> In terms of this particular chart review, it substantiated Dr. Lawler's concerns. I quickly saw that most of the work, including the work within the scope of the 24 hour codes, was being performed by hospital employees. It was very common for there to be no supporting documentation from the attending Neonatologist(s) for the 24 hour period in question, yet there were numerous notes reflecting work performed by hospital employees. It was not uncommon for there to be no note of any kind in a patient's chart from a Neonatologist for several days in a row.
>
> When there was documentation from a Neonatologist, it was often only an undated signature, or a short scribbled note that did not contain the necessary documentation to support the codes billed.

---

[3] Relator has redacted portions of Ms. Mullins' declaration out of an abundance of caution and respect for Defendants' anticipated position that certain subjects that Ms. Mullins discusses therein may be privileged. To be clear, Relator does not concede that any claim of privilege regarding these subjects made by Defendants is legitimate, and in fact Relator intends to strongly contest Defendants' claim of privilege.

I then reviewed Christiana's billing and observed that Christiana was not billing for the work being performed by hospital-employed providers, even though Christiana could have billed for some of this work (specifically, Christiana could have billed for services outside the bundled code performed by its employees).

I also reviewed the Neonatologists' billing records for the same patients and dates.  I confirmed that the Neonatologists' were billing the 24 hour NICU codes as if they had performed the work, even though the charts did not contain evidence that the Neonatologists' had performed the work.

Billing the 24 hour codes where the chart revealed that the work within the bundle was performed by hospital employees, and where the chart revealed no documentation that the attending Neonatologist had performed any work, was a widespread and prevalent practice that jumped out at you from the charts.

My findings were the same across all providers, e.g., the same documentation practices and billing practices were observed with regard to Medicaid patients and privately insured patients.

This was alarming to Ron Sherman and me.  In our opinion, these practices were fraudulent, and if a government auditor became aware of them, it would have been a major problem for Christiana.

(Ex. B at 1–3).[4]

As Ms. Mullins describes, Christiana decided the issues Dr. Lawler raised were serious enough to hire an external coding expert, Joan Gilhooly. Though Defendants have not produced a copy of Ms. Gilhooly's report (the "Gilhooly Report") under a claim of privilege (which Relator disputes),[5] Defendants produced documents prepared by Neonatology Associates in

---

[4] Relator's jurisdictional discovery requests sought Ms. Mullins' report (and other internal audit reports relating to other allegations in the Complaint).  Counsel for Relator was advised that Defendants conducted a diligent search for the reports and no such reports were located.

[5] Relator has informed Defendants several times that he believes that, even if the Gilhooly Report is privileged, that Defendants waived that privilege because, *inter alia*, they shared it with another party, namely, Neonatology Associates.  Defendants have responded that they had an oral joint defense agreement with Neonatology Associates, so those communications did not waive privilege.  During a meet and confer between counsel for the parties held on September 24, 2019, counsel for Relator asked counsel for Defendants for an affidavit outlining the parameters of this alleged oral joint defense agreement.  As of the time of this filing, Defendants have not produced any documentation pertaining to that agreement in response to Relator's request.

response to the Gilhooly Report.  In these documents, Neonatology Associates—the group accused of the primary billing fraud by Dr. Lawler and Mullins' audit—took issue with many of the findings in the Gilhooly Report, indicating that the Gilhooly Report did, in fact, confirm many of the findings of the compliance audit.  (*See* Ex. C, CCHS-000762 and CCHS-000763; Ex. D, CCHS-000769 and CCHS-000770).  However, even while providing this "rebuttal," Neonatology Associates admitted that some of their practices were incorrect and changed their behavior.  For example, in CCHS-000763, Dr. David Paul (from Neonatology Associates) responded to Ms. Gilhooly's finding that there was frequently no documented exam by the neonatologist by writing "[w]e should make clear that we immediately changed our policy following the meeting."  (Ex. C at 3).  Dr. Paul's rebuttal also confirms that the Gilhooly Report found that in the NICU, nurse practitioners provided care for the sickest babies, for babies in their first days and hours after being admitted, and while babies were crashing.  (*Id*. at 2–4).

In a meeting attended by Neonatology Associates, Christiana, and Ms. Gilhooly, Neonatology Associates brought in Dr. Richard Molteni as their own expert on neonatology billing, who also admitted that under the bundled codes, "a physician must perform a focused physical exam on each baby," and that not doing so "would not meet payer guidelines, as a focused physical exam was included in the development of the [Relative Value Units] associated to the critical care codes."  (Ex. E, CCHS-000757, at 2).  As noted by Ms. Mullins in her sworn affidavit, Neonatology Associates explicitly violated this requirement:

> I quickly saw that most of the work, including the work within the scope of the 24 hour codes, was being performed by hospital employees.  It was very common for there to be no supporting documentation from the attending Neonatologist(s) for the 24 hour period in question, yet there were numerous notes reflecting work performed by hospital employees.  It was not uncommon for there to be no note of any kind in a patient's chart from a Neonatologist for several days in a row.

> When there was documentation from a Neonatologist, it was often only an undated signature, or a short scribbled note that did not contain the necessary documentation to support the codes billed. . . .

> Billing the 24 hour codes where the chart revealed that the work within the bundle was performed by hospital employees, and where the chart revealed no documentation that the attending Neonatologist had performed any work, was a widespread and prevalent practice that jumped out at you from the charts.

(Ex. B at 2).

In another email from Dr. Stefano, he explained that on weekdays, Neonatology Associates had arranged to have two of its physician-employees rounding the NICU and seeing the babies there for three hours every weekday, for a total of six hours of rounding per weekday, and the hours those employees were present were between 9 AM and noon.  (*See* Ex. F, CCHS-000808 at 2).  On weekends, there was one attending rounding "5-6 hours per weekend day." (*Id*.).  Outside of those rounding hours, "[i]n the evenings, fellows, residents, and nurse practitioners"—i.e., Christiana employees—"provide first line care."  (*Id*)  This explanation from Dr. Stefano is essentially an admission of Dr. Lawler's first "allegation" that NICU "[p]rocedures are almost always done by NNPs/residents/fellows"—because Neonatology Associate physicians were not present for the majority of the day (only 3 hours per weekday, and only 5-6 hours on the weekend), most of the work for the babies in the NICU—including the work that Neonatology Associates billed for under the 24 hour billing codes—was performed by Christiana employees at no cost to Neonatology Associates, i.e., for free.

Additionally, as of July 2010, Christiana appears to have concluded that the way that Neonatology Associates was doing business was fraudulent.  As Dr. Stephen Pearlman, another leader of Neonatology Associates, wrote in July of 2010,

> The administration at Christiana Care has come to the following conclusion which I believe to be erroneous.  They are saying that if we use one of the bundled codes and an individual who does not work directly for our practice performs an

11

> included procedure on the baby, that it is fraudulent for us to bill the bundled
> code.

(Ex. G, CCHS-000476).  That email was sent approximately eight months before Christiana

made its 2011 CIA annual report containing the disclosure log entry mentioning part of Dr.

Lawler's allegation.

Turning to other relevant events not reported in the disclosure log, Christiana ultimately

put its Neonatology Department on an "Improvement Plan." (*See, e.g.,* Ex. H, CCHS-001612 at

1) ("The compliance department has been investigating how CCHS midlevel providers are being

utilized by non-employed physician groups.  Improvement Plans have been implemented in

Neonatology and Neuro Critical Care.").

In short, Christiana believed that it and Neonatology Associates were involved in a

kickback scheme in 2010 and 2011.  Most notably, Christiana was giving Neonatology

Associates free services from its nurses, hospitalists, residents and fellows, in exchange for

referrals from Neonatology Associates.  Because NICU services are extremely profitable for

Christiana, and the Neonatology Associates physicians had wide latitude to make decisions as to

which babies were admitted to the NICU, Christiana was highly incentivized to keep

Neonatology Associates happy.  Rather than tell HHS about these violations as reportable events,

which they were required to do by the terms of their CIA, Christiana's disclosure log entries

drastically downplayed these problems and gave a bare description of one dimension of the

genesis of its investigations—Dr. Lawler's "allegations"—buried within a log entry that

Christiana itself described in its Motion to Seal as being "unsubstantiated allegations, without

context or refutation."  (D.I. 13 at ¶ 5).  It is clear that this scanty description was effectively

misleading, not fully truthful, and left out material facts, and thus failed to provide notice to the

12

Government that fraud actually occurred.  The public policy concerns present here require that Relator be allowed to proceed with his FCA claims.

### 2.     *Allegations Involving Other Practices*

As the Court knows, Relator's Complaint makes similar allegations—namely, that Christiana provided free services to private physicians in exchange for referrals—as to various other hospital departments.  (*See* D.I. 1 at ¶¶ 87–88, 128–162).  Like the NICU "disclosure," Christiana's "disclosures" to the government as they relate to other hospital departments are similarly misleading.  This is the sum total of what Christiana advised OIG regarding the allegations in the non-NICU departments:

| Relator's Allegations | Disclosure Log Entries Identified by Defendants (*see* D.I. 13 at 6-8) |
|---|---|
| Outside Private Surgical Groups Using Christiana Employees to Perform Services (D.I. 1 at ¶¶ 87–88, 128–141) | "3/9/2011 Allegation from Medical Director of Hospitalists that outside Hospitalist Groups may be accepting consult requests from surgeons post-operatively without screening them for medical necessity for an Internal Medicine consult.  Also, that consult requests are made by surgeons simply to have someone monitor patients post-surgically when such monitoring is included in the global fee paid to surgeons by Medicare.  In certain cases, it is alleged that some outside Hospitalists will create a justification for the consult if, after visiting a patient, they find the consult was not really needed."  (D.I. 13, Ex. 4 at 1) |
| Neurosurgery Allegations (D.I. 1 at ¶¶ 87–88, 128–141) | "4/3/2012 Report by the Compliance Auditor that at times non-employed private neurosurgeons (on the Medical Staff) are not writing full consultation notes when a neurosurgical consult is requested by trauma surgeons, but are relying on notes of CCHS employed Neuro NPs who evaluate the patients initially.  Some neurosurgeons are merely countersigning NP notes or writing "agree with above".  Neurosurgeons must write their own full consultation note in order to bill for consultation services." (D.I. 13, Ex. 5 at 1) |
| Neurosurgery Allegations (D.I. 1 at ¶¶ 87–88, 128–141) | "2/19/2013 Report from the Compliance Auditor that at times CCHS employed Neuro NPs in the NCCU are following neurosurgery patients for routine post-operative care, and writing follow-up progress notes in the chart, since patients are placed there for recovery after neurosurgery.  These progress notes may not take the place of post-operative notes written by the neurosurgeons, since such follow up care is included in global fee billed to Medicare by the private neurosurgeons.  They are required to write their own comprehensive E&M notes to satisfy Medicare global payment requirements."  (D.I. 13, Ex. 5 at 3) |

| Relator's Allegations | Disclosure Log Entries Identified by Defendants (*see* D.I. 13 at 6-8) |
|---|---|
| Urology and ENT Allegations (D.I. 1 at ¶¶ 87–88, 142–162) | "7/14/2013 Supervising PA for the Urology & ENT reported concerns regarding initial coverage by hospital employed Pas on consultations made to private Urology or ENT Services, especially from the ED, with minimal or no follow-up thereafter from private attendings. The Medical Staff Bylaws require private attendings to evaluate patients within 24 hours of the initial PA response and to write a note substantial enough to determine the attending's level of involvement in the case. It was alleged that some attendings were merely cosigning or writing "agree with above". Substitution of the work of hospital employed PAs for the work of private attendings who are billing for the procedures or visits could be viewed as a Stark violation since private Urology and ENT groups refer business to hospital. Another issue allegedly involved the proper supervision of PAs by attendings and their lack of authority under State law to diagnose and treat patients without supervision. From an EMTALA perspective (patients with EMCs), CMS has issued guidance that permits an on-call physician to designate a PA to take first call in his/her place (if the ED physician agrees) but that guidance applies only to a situation where the PA is employed by that physician. Thus, with respect to patients with EMCs, a private on-call Urologist or ENT would be required to use his/her own PA to perform an initial consultation." (D.I. 13, Ex. 6 at 2) |

Meanwhile, what Christiana actually knew is detailed in the Complaint. (*See* D.I. 1 at ¶¶ 87–88, 128–162). Ms. Mullins' declaration further describes what Christiana actually knew about the allegations in other hospital departments as follows:

Subsequent to Dr. Lawler's complaint regarding the Neonatologists, the compliance department received similar complaints with regard to the "global billing" practices of private attending physicians in other departments such as neurology.

There are many "global codes" which a private attending physician can utilize to bill for care provided by the physician. In the context of surgery, these global codes typically involve preoperative care, the operative procedure itself, and post-operative care. It was reported to the compliance department that hospital-employed providers were performing services that were within certain global codes, but private attending physicians were billing for that work.

After meeting with Ron Sherman and discussing how to best proceed, a chart audit of neurology patients was performed. The charts were chosen randomly and included patients from all payer groups, including Medicare and private insurance. Consistent with the allegations made to the compliance department, the audits showed that attending physicians were billing global codes but that portions

of the work for which the doctors were billing was being performed by hospital employees.

For example, most surgical neurology global codes include pre-operative care, the procedure itself, and post-operative care. The doctors (or providers employed by the doctors, assuming the specific service(s) in question are within that person's scope of practice) are supposed to provide that care, and in exchange, they can bill for that care. However, the neurology chart reviews showed a pattern, namely, that hospital-employed providers such as nurse practitioners were performing care that was covered by the global codes, and the private attending's were billing as if they (the doctors) provided the care.

This practice was widespread and prevalent, particularly with regard to post-operative care. Generally speaking, post-operative care includes services such as evaluating the patient with regard to any reactions to anesthesia, unexpected bleeding, infection, healing of the suture site (if any), pain levels, mobility, fever, and/or respiratory function.

In many instances, doctors were billing global codes for post-operative work but the doctors did not see the patient at all after the operative procedure.

This behavior – specifically, Christiana employees performing post-operative care that was included in the global codes being billed by private attending physicians – was also widespread and prevalent with regard to private internal medicine physicians who performed general surgery, e.g., gall bladders, hernias, etc.

Christiana employees performing work that was billed for by private attending physicians was not limited to NICU 24 hour codes or global surgical codes. For example, the same issue existed in the context of specialty consults.

Specialty consults involve evaluating a patient with regard to the particular specialty in question. For example, a neurology specialty consult could possibly include services such as a history and physical examination, and evaluating the patient for orientation (to time, date and place), for headaches, for weakness on one or both sides of the body, etc.1 in order to determine a plan of care.

While I was working at Christiana, it was common for private attending doctors to bill for specialty consults that were conducted by hospital-employed providers. The following neurology specialty consult example was typical of what I observed on numerous occasions

• A patient would be admitted to the hospital and a neurology consult ordered
• The private attending neurologist would be contacted by hospital staff and asked to conduct the consult

15

         • The neurologist declined to conduct the consult and asks the Christiana Care-employed provider to conduct the consult

         • The Christiana Care provider would see the patient, document their physical findings, document their medical decisions for plan of care and give a report to the private attending. At a later time the neurologist would see the patient, possibly cosign the Christiana Care's provider note and/or document a short note of their own that did not meet coding/billing guidelines to support the private attending billing for the service.

         • Christiana Care would not bill for the consult

(Exhibit B, at 3–4).

       Documents that Christiana produced in response to the Court's order on jurisdictional discovery, further corroborate Relator's allegations in the Complaint and Ms. Mullins' declaration.  For instance, in an April 8, 2013 email discussing the fact that Christiana employees performed postoperative follow-up care that private physicians were billing for using bundled codes, Christiana compliance manager Christine Babenko wrote "[s]ince the [neurosurgeon] Group makes referrals to CCHS, this creates the risk that the scenario could be considered by CMS or OIG as a potential Stark or Anti-Kickback violation."  (Ex. I, CCHS-001616).  None of the disclosure log entries that Defendants point to regarding the neurosurgical service line allegations reference the fact that Christiana knew that these improper billing arrangements were potential violations of the Stark Law and/or the Anti-kickback Statute committed by Christiana. (*See* D.I. 13 at 7).  Later, Ms. Babenko wrote a similar email regarding the same problem with private ENT physicians and specifically referenced the fact that this arrangement could be a violation of the Stark Law and/or the Anti-kickback Statute.  (Ex. J, CCHS-001175).  The disclosure log entry Defendants cite on the ENT issue does not mention that Christiana itself may be in violation of the law, though Ms. Babenko's email expressly references that likelihood. (*See* D.I. 13 at 7–8).  Furthermore, Defendants never notified the Government of any of the fraud schemes discussed in Relator's Complaint as reportable events, as it was required to under

Section III.F of the CIA.  (D.I. 19, Ex. 2, CIA, at 14).  By failing to do so, Christiana gave the impression that these allegations were not serious and that no internal investigation had been performed, which was not true.

In sum, a log entry which provides a summary of any "issues or questions" raised by anyone regardless of how frivolous—and which by Christiana's own admission constituted nothing more than "unsubstantiated allegations, without context or refutation"—did not "explicitly inform the government of fraud."  That is particularly true when the entries do not name a single individual that was allegedly involved, does not discuss Christiana's potential liability, and does not discuss the extensive evidence that Christiana did in fact violate the AKS.  (D.I. 14, at 6–8) (*See, e.g.*, D.I. 1 at ¶¶ 97–98, 101, 109–111, 113–114, 121–126).  If the Defendants had complied with their CIA obligations and reported this information and detail as a "reportable event," as opposed to a brief and misleading summary in disclosure log, the government may have been "explicitly informed of the fraud."  That did not happen here.

### C. Relator Was Terminated by Defendants Because They Saw Him as a Threat to Their Relationship with Referring Private Physicians.

Relator led the internal compliance investigation into Dr. Lawler's allegations, and the similar allegations in other departments.  (D.I. 1 at ¶¶ 109, 113, 115–120, 138, 140, 148–154).  In the case of the NICU allegations, after receiving the memo from Dr. Lawler, the internal chart review from Rhonda Mullins, and the external audit from Joan Gilhooly, Christiana executives specifically considered, then decided against, calculating the amount that needed to be repaid and reporting the fraud to the Government.  (D.I. 1 at ¶ 126).  However, because he was so involved with investigating these allegations of fraud, many of the of private physician group became angry with Relator for "interfering" with their relationship with Christiana.  (D.I. 1 at ¶ 155).

17

Indeed, in an email exchange regarding the investigation of Neonatology Associates, Dr. Stefano expressed frustration with Relator for having rejected their proposal that Christiana and Neonatologist Associates "select and hire the auditor together."  (Ex. K, CCHS-000656 at 3). When he was informed that Joan Gilhooly would be starting her audit the following week, Dr. Stefano responded "This is very disappointing . . . . The agreement with Mr. Sherman was that we would have the opportunity to meet with the auditor separately and with Dr. Molteni **prior to** the actual audit."  (*Id.* at 1) (emphasis in original).  Later in the same conversation, Dr. Stefano offered that Neonatologist Associates would pay for half of the cost of the auditor if they could meet with the auditor beforehand and have their own expert on billing, Dr. Molteni, meet with the auditor before the audit began.  (*Id.*) ("I am also willing to pay for 50% of the entire audit (including travel costs) even though this specific auditor was not chosen by both parties.  I am making this offer to ensure that the auditor understanding that she is being hired by both parties to provide for greater trust and fairness to both of us.").  This exchange shows that Dr. Stefano was looking to influence the audit of Neonatologist Associates by Joan Gilhooly before the audit could even take place. The fact that Relator was not allowing the party that was the primary subject of the audit to shade the impressions of the auditor *a priori* clearly made Dr. Stefano frustrated with Relator.

Given that private physicians who were vital sources of referrals to Christian were upset that Relator was investigating their billing practices and financial arrangements with Christiana, it is sadly unsurprising that in 2014, when Dr. Janice Nevin was elevated to CEO of Christiana, she fired Relator.  As Relator alleges, Dr. Nevin took this action because she saw Relator as a threat to the relationship between the private physician groups and the hospital because of his knowledge of the allegations that the private physician groups were using hospital employees to perform their work for free.  (D.I. 1 at ¶¶ 157–159).  In fact, when Dr. Nevin fired Relator, she prevented him

from even returning to his office before he left the building which prevented him from collecting additional documents that could have helped this case.  (D.I. 1 at ¶ 160–61).

### D.    FCA Claims are Not Contemplated by the Agreement

When Relator was terminated he signed a Separation of Employment Agreement and General Release ("Agreement") which contained the following language:

> CCHS, its parent, subsidiary and affiliated entities . . . of and from all legally waivable actions and causes of actions, suits, debts, claims and demands whatsoever in law or in equity, arising on or before the effective date of this Agreement, which he ever had, now has, or which his heirs, executors or administrators hereafter may have . . . . matter, cause or thing whatsoever, and particularly, any claims concerning or relating in any way to his employment relationship or the termination of his employment relationship with CCHS, its parent, subsidiary and affiliated entities, including, but not limited to, any claims which have been asserted, could have been asserted, or could be asserted including but not limited to any claims arising under the Delaware Fair Employment Practices Act, Title 19, Chapter 7; Title VII of the Civil Rights Acts of 1964; 42 U.S.C. S2000e et. seq., the Age Discrimination in Employment Act, 29 U.S.C. S621 et. seq.; the Americans with Disabilities Act, 42 U.S.C. S12101 et. seq.; the Family and Medical Leave Act, 29 U.S.C. §2601 et.seq.; the Employee Retirement Income Security Act, 29 U.S.C. §1001 et. seq.; and the Genetic Information Nondiscrimination Act, all as amended, including any claims arising under any and all other federal, state or local laws, and any common law claims now or hereafter recognized, and all claims for counsel fees and costs.

(D.I. 19, Ex. 1 at ¶ 1).

It is undisputed that Christiana was acutely aware of the FCA due to the Corporate Integrity Agreement it was under pursuant to a separate FCA settlement Christiana entered in 2010.  (D.I. 1 at ¶ 46).  Yet, despite the extensive and comprehensive coverage of certain claims, the release never mentions *qui tam* claims brought on behalf of the government under the FCA. Because the Agreement was drafted by Defendants with exquisite knowledge of the FCA's *qui tam* provisions, the release should not be construed to encompass *qui tam* claims brought on behalf of the government under the FCA.

19

### E.     Relator Has Complied with Delaware's False Claims Act.

Defendants' final argument in their MTD is that Relator's claims under the Delaware FCA must be dismissed because Relator did not comply with certain procedural requirements—specifically, that the Delaware Department of Justice did not give a notification of declination. (D.I. 19 at 18-19).  However, on January 10, 2019, the State of Delaware filed its "Notice of Election to Decline Intervention" in the docket for this case.  (D.I. 20).  That Notice specially stated "Although the State of Delaware declines to intervene, the State respectfully refers the Court to 6 Del. C. § 1203(b)(1), which allows the relator to maintain the action in the name of the government; provided, however, that the 'action may be dismissed only if the court and the Department of Justice give written consent to the dismissal and their reasons for consenting." (*Id*.). Accordingly, Defendants' argument regarding the Delaware FCA claims must be rejected.

## V.     <u>CONCLUSION</u>

The Court has subject matter jurisdiction in this matter.  Accordingly, Defendants' Motion to Dismiss should be denied.

**BERGER MONTAGUE**

By: *<u>/s/ Daniel R. Miller</u>*
     Daniel R. Miller (DE Id. #3169)
     1818 Market Street, Suite 3600
     Philadelphia, PA 19103
     Telephone: (215) 875-3000
     dmiller@bm.net

Dated: October 3, 2019                          *Attorney for Relator*